UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL P. STODDARD,<br><br>                Plaintiff,<br><br>    v.<br><br>CMS, WARDEN OF IMSI,<br>PSYCHNURSE PATCHET, DR.<br>SOMBKE, DR. GREEN, DR. CRAIG,<br>DR. SOLARIS, and DR. KHATTAIN,<br><br>                Defendants. | Case No. 1:08-CV-00056-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are a Motion to Dismiss and a Motion for Summary Judgment filed by Defendants Correctional Medical Services, Inc. (CMS); Sheryl Salaris, M.D.; and Jocelyn Patchett (collectively CMS Defendants) (Dkt. 25 & 26). The Motions are fully briefed. Having reviewed the record, the Court finds that oral argument is unnecessary. Accordingly, having considered the Motion, Response, and Reply, and all supporting affidavits and exhibits, the Court enters the following Order.

## BACKGROUND

Plaintiff Daniel Stoddard (Plaintiff), an inmate, alleges that he received constitutionally inadequate medical, psychiatric, and mental health care from the CMS

**MEMORANDUM DECISION AND ORDER - 1**

Defendants, whose duty it was to provide such care to inmates under contract with the Idaho Department of Correction (IDOC). Plaintiff was permitted to proceed on his Amended Complaint (Dkt. 6) and his Second Amended Complaint (Dkt. 8), liberally construed together.

On August 28, 2009, Plaintiff was ordered to provide service addresses for any remaining defendants against whom he had been authorized to proceed (Dr. Khattain, Dr. Sombke, Dr. Green, and Dr. Craig, Warden of IMSI), or claims against them would be dismissed. (Dkt. 18.) On June 29, 2010, Plaintiff's request to remove Dr. Green and Dr. Craig as defendants was granted. (Dkt. 29.) Plaintff did not provide service addresses for the remaining defendants.

## STANDARD OF LAW

Summary judgment is appropriate where a party can show that, as to any claim or defense, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1)(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

**MEMORANDUM DECISION AND ORDER - 2**

that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986)*.* Material facts are those that may affect the outcome of the case. *See id*. at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(1)(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv*., 809 F.2d at 630-31 (internal citation omitted).

The existence of a scintilla of evidence in support of the non-moving party's

position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252. Rule 56(e) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it."

To state a claim under the Eighth Amendment, a plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).

The Supreme Court has opined that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*

> The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*,

**MEMORANDUM DECISION AND ORDER - 4**

*WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

Under the Eighth Amendment, "a convicted prisoner is entitled to psychological or psychiatric care for serious mental or emotional illness." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). There is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric

**MEMORANDUM DECISION AND ORDER - 5**

counterpart." *Id*. (internal citation omitted). The Eighth Amendment claim fails if the need is not serious, or if the defendants have not exhibited deliberate indifference in providing diagnostic services and treatment.

## DISCUSSION

Plaintiff is proceeding pro se, and thus his pleadings must be liberally construed. He filed his Civil Rights Complaint on November 19, 2008 (Dkt. 3) and later filed a supplemental Second Amended Civil Rights Complaint. (Dkt. 8.) Plaintiff alleges that Defendants provided constitutionally inadequate medical, psychiatric, and mental health care. In Plaintiff's Complaint, he detailed incidents beginning in 2004, but the Court permitted him to proceed only on claims that accrued no more than two years prior to the filing of the Complaint. (Dkt. 9, p. 2.)

In the Motion for Summary Judgment, Defendants Correctional Medical Services, Inc.(CMS), Sheryl Salaris, M.D., and Jocelyn Patchett argue that between January 23, 2007 (two years prior to the filing of his original Complaint) and the date of the Motion for Summary Judgment, the care received was constitutionally adequate.

1. **Plaintiff's Care Before January 23, 2007**

Although Plaintiff's care before January 23, 2007, cannot serve as the basis for a claim because that time period is beyond the statute of limitations, it is important to review the care to provide a history of his medical and mental health issues. Throughout Plaintiff's incarceration, he has required psychiatric care for various conditions, including schizophrenia, paranoid type, and personality disorder with mixed antisocial trait/narcissistic traits. (Jocelyn Patchett Affidavit Exhibits, p. 10, Dkt. 26-3.)

Defendants have produced Plaintiff's medical and psychiatric records from 2006 to show that Plaintiff has received regular evaluations, treatment, and monitoring for his psychiatric condition from Psychiatrist Kenneth Khatain, Psychologist Sharlene Green, Psychiatric Technician Michael Shaw, Registered Nurse Practitioner Mary Hicks, and Psychiatric Technician Jocelyn Paskett. The records show that Plaintiff's mental health care was not stagnant during that time period, but his treatment plan was revised and updated to accommodate Plaintiff's symptoms. Treatment included the following:

- Psychiatric consultation of 5/10/06 indicated that Plaintiff's Prolixin[1] was reduced because staff felt he had been doing reasonably well. Plaintiff was encouraged to tell staff if his psychotic symptoms increased.

- Psychologist notes of 6/12/06 indicated that Dr. Sharlene Green placed Plaintiff in group therapy (which continued into 2007).

---

[1] Prolixin is another name for fluphenazine, which is an anti-psychotic medication used to treat psychotic disorders such as schizophrenia. See http://www.drugs.com.

**MEMORANDUM DECISION AND ORDER - 7**

- Psychiatric consultation of 6/14/06 indicated that Plaintiff requested that Seroquel[2] be stopped and Prolixin be further reduced. Dr. Khattain agreed to stop the Seroquel but kept the Prolixin the same.

- Psychiatric consultation of 7/19/06 indicated that Plaintiff was doing well on medication but reported feeling sluggish. The same medication routine continued for six weeks.

- Psychiatric consultation of 09/06/06 showed that Plaintiff wanted to stop his Prolixin shot for one or two cycles. He wanted to see how he would do to see if he is mentally more stable and able to handle a slight amount of psychotic thinking; he wanted to stop Paxil[3] so he could feel his emotions more. Dr. Khatain disagreed with stopping the Prolixin, but stopped the Paxil. He was also taking Cogentin[4] for stiff muscles and Propranolol[5] for restlessness.

- Treatment plan of 09/08/06 indicated that Plaintiff "wants to see what natural state of mind is."

---

[2] Seroquel (quetiapine) is an anti-psychotic medication used to treat schizophrenia. See http://www.drugs.com.

[3] Paxil is an antidepressant, used to treat depression, obsessive-compulsive disorder, and anxiety. See http://www.drugs.com.

[4] Cogentin (benztropine) is used to treat the symptoms of Parkinson's disease, such as muscle spasms, stiffness, and poor muscle control, and it is used to control tremors and stiffness of the muscles due to certain anti-psychotic medicines. See http://www.drugs.com.

[5] Propranolol is a beta-blocker used to treat tremors, angina, and hypertension.

- Psychiatric consultation of 10/18/06 showed that patient and staff reported some increase in psychiatric symptoms. The patient was noted to be insightful enough to recognize this and agreed to an increase in his Prolixin Decanoate shot. He felt overmedicated at 50 mg, but was willing to try 37.5 mg.

- Treatment plan of 12/08/06 indicated that Plaintiff was diagnosed with schizophrenia, paranoid type, and a personality disorder, with mixed antisocial/narcissistic traits. The plan included a diagnosis, goals, and special needs considerations. It was signed by the treatment team members.

(See Dkt. 26-3, Plaintiff's medical records attached to Affidavit of Jocelyn Paskett.)

2. **Plaintiff's Care From January 23, 2007**

Defendants argue that Plaintiff was evaluated every month for his psychiatric condition after January 2007, including in both routine scheduled evaluations and urgent care evaluations by medical and mental health care personnel. His psychotropic medications and group therapy were continued. Varied treatment plans were implemented. Plaintiff's condition improved in June 2008, when he was transferred to a less restrictive environment at Idaho State Correctional Institution (ISCI). As of Plaintiff's last filing, on July 21, 2010, he was still housed at ISCI.

The Court concludes that Plaintiff's medical and mental health records show that he was regularly and appropriately treated after January 23, 2007. A summary of his care includes:

**MEMORANDUM DECISION AND ORDER - 9**

- During a mental health evaluation of January 26, 2007, by Michael Shaw, Psychiatric Technician, Plaintiff reported that he was angry that his family had not forgiven him for murdering his father. He reported having visions and delusional thinking at times. Shaw reported Plaintiff's status to the treatment team.

- Mental health evaluation of January 31, 2007, by Shaw indicated that Plaintiff had the urge to cut himself as a release for internal chaos, and staff were alerted as to this condition.

- Mental health records indicate that staff reported Plaintiff was not doing as well as before, because he was intruding on others' personal boundaries, deteriorating in his personal hygiene and therapeutic group attendance, and appeared to be decompensating. As a result, Psychiatric Technician Patchett reviewed and updated Plaintiff's treatment plan, and on March 22, 2007, Plaintiff was moved to Tier 3.

- On March 28, 2007, Plaintiff was moved back to Tier 2, with a plan for improvement of his behavior.

- A psychiatric review on March 29, 2007, by Dr. Kruzich noted that Plaintiff reported some auditory hallucinations, but was otherwise stable. Plaintiff did not feel that a change in medication was necessary, and so Dr. Kruzich continued Plaintiff's prescription regimen.

- A psychiatric evaluation of April 20, 2007, by Shaw noted that Plaintiff was

focused on ways to get out of prison and into a mental hospital because of Plaintiff's concern that prison would cause him to have a psychotic episode. Staff noted that Plaintiff continued to decompensate, not cleaning his cell, struggling to get out of bed, declining in hygiene and group therapy participation, and continuing to discuss not taking his medications.

- Plaintiff was moved to Tier 3 on June 6, 2007, as a result of his continued bad behavior, which included pressuring his cellmate for food, intruding on personal boundaries of peers and staff, and reporting thoughts of cutting himself for reasons other than suicide, such as a statement that "It's a pop culture thing for my generation."

- During a psychiatric evaluation of June 14, 2007, Plaintiff told Dr. Kruzich that he wanted to go off his medications and be angry and depressed. Dr. Kruzich noted that Plaintiff had been managing adequately but was on the edge of possible decompensation. After much discussion and input from staff, Plaintiff agreed to increase his Prolixin and continue Propranolol and Cogentin.

- A psychological evaluation of June 18, 2007, indicated that Plaintiff wanted to reduce his medication so he could experience moods. Dr. Craig, Ph.D., determined that Plaintiff may have been trying to set up a situation where he could self-mutilate. Dr. Craig ordered that Plaintiff be monitored for self-mutilation and encouraged to take his medication.

**MEMORANDUM DECISION AND ORDER - 11**

- In June and July 2007, after Plaintiff was moved back to Tier 2, he showed improved hygiene.

- In August 2007, Plaintiff's treatment plan was updated by Jocelyn Patchett. He had become defiant, refusing interaction with other, not participating in his groups, and indicating a desire not to take his medication.

- On October 8, 2007, Plaintiff was evaluated by video teleconferencing by Dr. Salaris. At that time, Plaintiff had no complaints, and reported that medications helped him with hallucinations and religious delusions. He admitted to significant deterioration in hygiene and becoming angry and hostile when psychotic.

- In November 2007, Plaintiff was evaluated by Dr. Solaris. Plaintiff asked to have his medications lowered because he wanted to be less stable because he liked the excitement. Dr. Salaris continued Plaintiff's existing medications.

- In December 2007, Plaintiff was monitored and his hygiene and group participation continue to deteriorate. He asked to stop his medication, but he did not refuse to take it.

- In January 2008, Plaintiff's behavior was monitored, and he continued to deteriorate.

- At a psychological evaluation in February 2008, Psychological Technician Schilling noted that Plaintiff was medication compliant and was requesting

a job.

- On March 3, 2008, Plaintiff was evaluated by video teleconferencing by Dr. Salaris. He again requested a decrease in medication, because he didn't like being normal. Dr. Solaris noted Plaintiff's history of requesting medicine changes to bring out decompensation. She set a short term goal to keep Plaintiff medication complaint, and set a long-term goal to maintain compliance and improve his functioning. She continued the same medication levels.

- In February, March, and April 2008, monitoring notes indicate that Plaintiff's behavior improved. He indicated that he wanted to be transferred to Unit 16, the Behavioral Health Unit, at ISCI, a less restrictive environment than IMSI. He continued to indicate that he didn't want to take his medication and that he liked the status of being depressed and slightly psychotic. He said he took the medication only to avoid being committed, which would mean he would be transferred to a more restrictive part of IMSI.

- On May 1, 2008, Psychological Technician Schilling evaluated Plaintiff and noted that he appeared to be manipulating programming to suit his needs. She outlined a rigid treatment program setting forth the behaviors expected of Plaintiff for him to be able to be transferred to ISCI. Plaintiff's hygiene improved almost immediately, and other improvements were noted. His

**MEMORANDUM DECISION AND ORDER - 13**

existing medications were continued.

- On June 26, 2008, Plaintiff was transferred to ISCI as a result of his good behavior. He was cleared for general population and placed on the Behavioral Health Unit. His existing medications were continued.

- On July 7, 2008, Plaintiff was evaluated by Dr. Clark and found to be maintaining in the unit and functioning OK.

- At a formal mental health assessment report evaluation on August 21, 2008, made for the purpose of developing a treatment plan for the Behavioral Health Unit, Plaintiff appeared clean and well-groomed and did not report having any hallucinations or delusions while on medication. Plaintiff was continued on his medications and referred to various group therapy sessions.

- On August 28, 2008, Plaintiff requested work because he wanted to earn some money.

- On September 21, 2008, Plaintiff was evaluated by Dr. Clark, who continued Prolixin but discontinued other medications. Plaintiff reported that he was applying for jobs and doing fine.

- On December 9, 2008, Dr. Clark noted that Plaintiff was going to work in the laundry, staying in his cell because he was frequently tired, and that he liked to be mildly psychotic. Dr. Clark decreased Plaintiff's Prolixin at that time.

(See Sheryl Salaris Affidavit & Exhibits, Dkt. 26-4 to 26-7.) The Court notes that Plaintiff continues to be housed at ISCI.

Plaintiff's arguments that he received constitutionally inadequate medical and mental health treatment are unavailing in the face of his extensive medical and mental health records. Plaintiff particularly alleges that without individual counseling, he has suffered emotional apprehension and anxiety. Plaintiff argues that the sentencing judge in his state criminal case stated that Plaintiff would need both medication and counseling to appropriately manage his symptoms. Dkt. 30, p. 2. Plaintiff also argues that CMS "operates under IDOC policy and [is] not equipped for individual treatment and care." (Dkt. 30, p. 2.)

The CMS Defendants have not provided a specific response to Plaintiff's allegation that failure to provide individual counseling to Plaintiff violated the Eighth Amendment. Instead, they have generally outlined the medical and mental health care provided to Plaintiff, including group therapy. The Court concludes that the facts provided are sufficient to show that Plaintiff received constitutionally adequate individual medical and mental health evaluation and treatment, despite the fact that he received no regular individual counseling and he believes he suffers from emotional apprehension and anxiety (though no evidence in the record exists to show that his emotional apprehension and anxiety were actually caused by the failure to provide individual therapy).

Even though Plaintiff's sentencing judge believed that medication and counseling would be the best course of treatment, nothing in the record shows that individual

**MEMORANDUM DECISION AND ORDER - 15**

counseling, rather than group counseling, was singularly required. The Eighth Amendment does not necessarily require individual mental health counseling sessions, nor does it demand that a patient be treated until he is apprehension-free and anxiety-free.

Nothing in the record shows that Plaintiff's condition deteriorated as a result of the failure to provide individual therapy or that his mental health conditions were not monitored and treated. In fact, Plaintiff's condition improved in 2008, showing that his course of treatment was appropriate.[6] Plaintiff has been involved in group therapy counseling sessions for several years, which appear appropriately gauged to help him with his symptoms. While in an ideal world, psychiatric medication and group therapy would be supplemented with individual therapy sessions, in prison the standard is that prisoners are entitled to adequate, but not the best available, medical and mental health care; inmates are not entitled to "have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. at 9. An inmate's medical and mental health treatment must be the equivalent of "cruel and unusual punishment" in order to violate the Eighth Amendment. That is certainly not the case here.

Plaintiff further alleges in his Second Amended Complaint that he should be made a ward of the state and be hospitalized rather than incarcerated. He argues that he is "being warehoused without treatment." Nothing in the record shows that Plaintiff's condition is such that he should be hospitalized. In fact, Plaintiff improved to the degree

---

[6] The Court also notes that Plaintiff's Second Amended Complaint (Dkt. 8) reflects lucid thought, skillful writing, and appropriate argument.

**MEMORANDUM DECISION AND ORDER - 16**

that he was able to perform a paying job in the prison laundry. In addition, Plaintiff's medical and mental health records show that he is not being "warehoused without treatment," but that he has been consistently treated with medication, personal evaluations, and group therapy. From July 2008 to date, Plaintiff has continued to maintain his status at ISCI, a lower security prison with more personal privileges than IMSI, where he was housed when he filed his civil rights complaint on January 31, 2008.

Generally in his Second Amended Complaint, Plaintiff alleged that Dr. Salarais was unwilling to reduce his medication, causing him harm. In his Response to the Motion for Summary Judgment, Plaintiff more specifically argues that on June 14, 2007, Dr. Salaris prescribed 50 mg of Prolixin and refused to lower it, giving him no choice but to take it or suffer. Dr. Salaris responds that she did not treat him on that date, but Dr Kruzich rendered treatment on this date.

Dr. Salaris argues that, in any event, Plaintiff was appropriately treated by Dr. Kruzich (not a defendant), who prescribed the Prolixin at that level for 90 days. The entire record reflects that sometimes the medication was lowered, sometimes it was increased, and sometimes it was changed. It remains true that Plaintiff has not pointed to any suffering that would outweigh the benefit of his medication, nor has he shown that the dosage was medically inappropriate for his condition. The record is replete with instances of Plaintiff requesting changes in his medication for various reasons (including to counter side-effects and to determine whether he could function at a lower dosage of medication) and with Plaintiff's mental health providers analyzing his requests, and then

**MEMORANDUM DECISION AND ORDER - 17**

accommodating those requests thought to be in Plaintiff's best interests to manage his psychiatric condition. Plaintiff's mental health providers did not always agree with Plaintiff's requests, but the record (including Plaintiff's allegations) does not show that the mental health providers acted out of deliberate indifference, rather than a desire to craft an adequate treatment plan for Plaintiff.

The Court permitted Plaintiff to proceed against CMS and the Warden of IMSI on a policy-based claim. (Dkt. 9.) However, Plaintiff has failed to show that the medical and mental health care he received was inadequate. Therefore, it follows that he necessarily has failed to show that a policy caused him to receive inadequate medical and mental health care. Accordingly, Defendant CMS, Inc., and the Warden of IMSI are entitled to summary judgment.

3.  **Conclusion**

Defendants are entitled to summary judgment on Plaintiff's claims because Plaintiff has failed to show that the medical and mental health treatment he received within the statute of limitations period was inadequate or that his treatment was prescribed him in a deliberately indifferent manner. A difference of opinion between an inmate and his treating health care providers is not actionable, where the inmate's medical records show that he has received consistent care that has been reviewed and updated according to the inmate's symptoms. Accordingly, the Court will grant summary judgment to Defendants on all claims.

The Court will dismiss all claims against all Defendants (including the unserved

Defendants) with prejudice because it is clear from the medical records that the medical and mental health care provided by all Defendants that is within the statute of limitations period was adequate under the Eighth Amendment. As a result of the granting of the Motion for Summary Judgment, Defendants' Motion to Dismiss on grounds that Plaintiff failed to exhaust his administrative remedies will be denied as moot.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion to Dismiss (Dkt. 25) is DENIED as MOOT;

2. Defendants' Motion for Summary Judgment (Dkt. 26) is GRANTED; and

3. Plaintiff's Amended Complaint (Dkt. 6) and Second Amended Complaint (Dkt. 8), and this entire case, are DISMISSED with prejudice.

DATED: **February 12, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge